Slip Op. 20-181

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED, <br><br>   **Plaintiff,** <br><br> **and** <br><br> THAI PREMIUM PIPE COMPANY LTD. and PACIFIC PIPE PUBLIC COMPANY LIMITED, <br><br>   **Consolidated Plaintiffs,** <br><br> **v.** <br><br> UNITED STATES, <br><br>   **Defendant,** <br><br> **and** <br><br> WHEATLAND TUBE COMPANY, <br><br>   **Defendant-Intervenor.** | Before: Jennifer Choe-Groves, Judge <br><br> Consol. Court No. 18-00214 |

<u>**OPINION AND ORDER**</u>

[Remanding the U.S. Department of Commerce's remand results in the 2016–2017 administrative review of the antidumping duty order covering circular welded carbon steel pipes and tubes from Thailand.]

Dated:  December 21, 2020

Daniel L. Porter, Tung Nguyen, and Kimberly Reynolds, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for Plaintiff Saha Thai Steel Pipe Public Company Limited.

Robert G. Gosselink, Jonathan M. Freed, and Aqmar Rahman, Trade Pacific, PLLC, of Washington, D.C., for Consolidated Plaintiff Thai Premium Pipe Company Ltd.

Lizbeth R. Levinson, Ronald M. Wisla, and Brittney R. Powell, Fox Rothschild LLP, of Washington, D.C., for Consolidated Plaintiff Pacific Pipe Public Company Limited.

Elizabeth A. Speck, Senior Trial Counsel, and L. Misha Preheim, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With them on the brief were Joseph H. Hunt, Assistant Attorney General, and Jeanne E. Davidson, Director.  Of counsel on the brief was Brandon J. Custard, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Roger B. Schagrin, Elizabeth J. Drake, Christopher T. Cloutier, and Luke A. Meisner, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor Wheatland Tube Company.

Choe-Groves, Judge:  Plaintiff Saha Thai Steel Pipe Public Company Limited

("Saha Thai") and Consolidated Plaintiffs Thai Premium Pipe Company Limited ("Thai

Premium") and Pacific Pipe Public Company Limited ("Pacific Pipe") (collectively, "Plaintiffs")

filed this consolidated action challenging the final results published by the U.S. Department of

Commerce ("Commerce") in the 2016–2017 administrative review of the antidumping duty

order on circular welded carbon steel pipes and tubes ("CWP") from Thailand.  See Circular

Welded Carbon Steel Pipes and Tubes From Thailand ("Final Results"), 83 Fed. Reg. 51,927

(Dep't Commerce Oct. 15, 2018) (final results of antidumping duty administrative review; 2016–

2017); see also Decision Mem. for the Final Results of Antidumping Duty Admin. Review;

2016–2017, PD 143 (Oct. 4, 2018) ("Final Decision Memorandum" or "Final IDM").[1]  Before

the court are the Final Results of Redetermination Pursuant to Remand, ECF Nos. 62, 63

("Remand Results"), which the court ordered in Saha Thai Steel Pipe Public Co. v. United States

("Saha Thai I"), 43 CIT __, 422 F. Supp. 3d 1363 (2019).

　　　　Plaintiffs argue that Commerce did not comply with the court's remand order, which

required Commerce to reconsider its unlawful particular market situation adjustment in

---

[1] Citations to the administrative record reflect the public record ("PD") document numbers.

accordance with the court's opinion, noting the absence of a direct instruction from the court for Commerce to reverse its particular market situation adjustment.  [Thai Premium]'s Comments O'ppn Remand Redetermination at 5–6, ECF Nos. 65, 66 ("Thai Premium Cmts."); Pl. Saha Thai's Comments Commerce's Redetermination Remand at 2–3, ECF No. 67 ("Saha Thai Cmts."); Pl. Pacific Pipe's Comments Commerce's Remand Redetermination at 2–3, ECF No. 68 ("Pacific Pipe Cmts.").  Plaintiffs assert that Commerce's Remand Results set forth an impermissible new justification for a particular market situation adjustment to the cost of production that is contrary to the court's remand order, Commerce's regulations, the applicable statute, and procedural fairness.  Thai Premium Cmts. at 7, 9; Saha Thai Cmts. at 3; Pacific Pipe Cmts. at 3.

Thai Premium asserts that normal value for Thai Premium was based on constructed value in the Final Results and asks the court to address whether Commerce's particular market situation adjustments in the Final Results were supported by substantial evidence.  Thai Premium Cmts. at 3–4.  In the Constructed Value Profit section of the Remand Results, Commerce noted Thai Premium's assertion that in the Final Results "Commerce used [constructed value] as a basis for normal value for Thai Premium because Thai Premium did not have sales of the foreign like product in the ordinary course of trade . . . ."  Remand Results at 22–23 (citing Thai Premium's comments to the draft remand results).  On remand, however, the basis for Thai Premium's constructed value was not the lack of sales of the foreign like product in the ordinary course of trade but Commerce's particular market situation determinations, which the court discusses below.  Id. at 7–9.  Because Commerce changed its methodology in the Remand Results, the issues of (1) whether Thai Premium's normal value was properly based on constructed value due to the lack of sales of the foreign like product in the ordinary course of

trade, and (2) whether Commerce's subsequent particular market situation adjustments were supported by substantial evidence in the Final Results are not before the court at this time.

For the following reasons, the court remands the Remand Results.

## BACKGROUND

The court presumes familiarity with the facts and procedural history as set forth in its prior opinion and recounts the facts relevant to the court's review of the Remand Results. See Saha Thai I, 43 CIT at __, 422 F. Supp. 3d at 1365–67.

Defendant-Intervenor Wheatland Tube Company ("Wheatland") submitted factual information alleging that a particular market situation in Thailand during the period of review distorted the costs of hot-rolled steel coil. Wheatland Allegation Letter at 1, PD 69–71 (Feb. 5, 2018) ("Wheatland Allegation"). Wheatland alleged the existence of two independent particular market situations, either one of which was purportedly sufficient on its own to distort the cost of production of CWP: (1) the Royal Thai Government subsidized Thai producers of hot-rolled coil, enabling its sale at below-market prices to downstream producers of CWP, and (2) the prices for imports of hot-rolled coil into Thailand were distorted through dumping, subsidization, and global overcapacity. Id. at 4–5. Wheatland requested that Commerce "use an alternative calculation methodology to calculate constructed value under 19 U.S.C. § 1677b(e) in this proceeding." Id. at 1. Commerce accepted Wheatland's submission alleging the existence of a particular market situation as to cost of production under 19 C.F.R. § 351.301(c)(2)(v) and set a deadline for submissions to rebut, clarify, or correct the Wheatland Allegation. Commerce Deadline Mem. at 1–2, PD 81 (Mar. 21, 2018). Saha Thai and Pacific Pipe submitted rebuttal factual information. Saha Thai Rebuttal, PD 83 (Mar. 28, 2018); Pacific Pipe Rebuttal, PD 84–85 (Mar. 28, 2018).

In the Final Results, Commerce determined that a particular market situation distorted the acquisition cost of hot-rolled coil, a major CWP input, and applied an upward adjustment to the respondents' reported cost of production.[2]  Final IDM at 8–10.  Commerce conducted the sales-below-cost test and disregarded certain of Saha Thai's, Pacific Pipe's, and Thai Premium's home market sales made at prices below the cost of production.  See Circular Welded Carbon Steel Pipes and Tubes from Thailand: Decision Mem. for the Prelim. Results of Antidumping Duty Admin. Review; 2016–2017 at 15–16, PD 87 (Apr. 3, 2018) ("Preliminary Decision Memorandum" or "Prelim. DM").  Commerce calculated normal value from the remaining above-cost home market sales and stated expressly that "[it] calculated [normal value] based on the price Pacific Pipe, Saha Thai, and Thai Premium reported for home market sales . . . ."  Id. at 16.  "Where [Commerce] w[as] unable to determine [normal value] based on home market sale prices of comparable merchandise, . . . [Commerce] based [normal value] on constructed value (CV)."  Id.  Commerce did not state in the Preliminary Decision Memorandum or the Final Decision Memorandum that normal value for Thai Premium was based on constructed value.  See Prelim. DM; Final IDM.  Commerce calculated Plaintiffs' weighted-average antidumping margins as 28% for Saha Thai, 30.61% for Pacific Pipe, and 30.98% for Thai Premium.  Final Results, 83 Fed. Reg. at 51,928.  The court concluded in Saha Thai I that Commerce's cost-based particular market situation adjustment was unlawful and remanded to Commerce "for further consideration consistent with this opinion."  43 CIT at __, 422 F. Supp. 3d at 1371.

Commerce filed the Remand Results under respectful protest and stated that it disagreed with the court in Saha Thai I.  Remand Results at 1, 6.  Rather than reverse its particular market

---

[2] Saha Thai, Pacific Pipe, and Thai Premium were the only three producer-exporters covered by this administrative review.  Final IDM at 2.  All three were individually examined as mandatory respondents.  Remand Results at 3.

situation determination, Commerce maintained its determination that a particular market situation distorted the cost of production.  Id. at 7–8.  Commerce declined to conduct the sales-below-cost test because it explained that the sales-below-cost test would not be "meaningful" without an adjustment to the cost of production to account for the particular market situation.  Id. Commerce instead made a particular market situation determination under 19 U.S.C. § 1677(15)(C), stating that the distorted cost of production prevented a proper comparison between home market sales and export prices, and disregarding all home market sales.  Id. at 8. Commerce based normal value on constructed value for each respondent on remand.  Id. at 1–2, 8–9.  Commerce made a particular market situation determination under 19 U.S.C. § 1677b(e) as to cost of production and calculated constructed value with an adjustment to the cost of production as an alternative calculation methodology.  Id. at 8–9.  Commerce calculated constructed value profit for each respondent by the alternative method of using Saha Thai's home market selling expense ratios and profit rate from the 2015–2016 administrative review. Id. at 9–11.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the court authority to review actions contesting the final results of an administrative review of an antidumping duty order.  The court will uphold Commerce's determinations unless they are unsupported by substantial evidence on the record or otherwise not in accordance with the law.  19 U.S.C. § 1516a(b)(1)(B)(i).  The court also reviews determinations made on remand for compliance with the court's remand order.  Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT __, __, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I.        Governing Law

Commerce determines antidumping duties by calculating the amount by which the

normal value of subject merchandise exceeds the export price or the constructed export price for

the merchandise.  19 U.S.C. § 1673.  When reviewing antidumping duties in an administrative

review, Commerce must determine: (1) the normal value and export price or constructed export

price of each entry of the subject merchandise, and (2) the dumping margin for each such entry.

Id. § 1675(a)(1)(B), (a)(2)(A).  The statute dictates the steps by which Commerce may calculate

normal value "to achieve a fair comparison" with export price or constructed export price.  Id.

§ 1677b(a).

First, the statute specifies the methodology for Commerce to determine which sales

should be considered and disregarded in calculating normal value.  Normal value is "the price at

which the foreign like product is first sold . . . in the exporting country . . . in the ordinary course

of trade."  Id. § 1677b(a)(1)(B)(i).  Sales outside the ordinary course of trade are excluded from

normal value.  "Ordinary course of trade" is defined in Section 1677(15) as excluding: (1) sales

made at less than the cost of production, and (2) sales that cannot be compared properly with the

export price or constructed export price due to a particular market situation.  Id. § 1677(15)(A),

(C).  To determine whether "sales . . . have been made at prices that represent less than the cost

of production," the statute directs Commerce to conduct the sales-below-cost test.  Id.

§ 1677b(b)(1).  The cost of production is defined by statute to include the cost of materials and

processing, amounts for selling, general, and administrative expenses, and the cost of all

containers and expenses incidental for shipment.  Id. § 1677b(b)(3).  Sales that Commerce

determines, by application of the sales-below-cost test, were made at prices below the cost of

production, or that Commerce determines were made in a particular market situation, are outside

the ordinary course of trade and are disregarded from the calculation of normal value.  See id.

§ 1677b(b)(1), (a)(1)(B)(i).  "Whenever such sales are disregarded, normal value shall be based

on the remaining sales of the foreign like product in the ordinary course of trade."  See id.

§§ 1677b(a)(1)(B)(i), (b)(1); 1677(15)(A), (C).

Second, when using market prices to determine normal value, Commerce may make

certain adjustments to the remaining home market prices.  The statute lists authorized

adjustments for incidental shipping and delivery expenses, direct taxes, and differences between

the subject merchandise and foreign like products in quantity, circumstances of sale, or level of

trade.  Id. § 1677b(a)(6), (7).

Third, if Commerce cannot determine the normal value of the subject merchandise based

on home market sales, then Commerce may use qualifying third-country sales or constructed

value as a basis for normal value.  Id. § 1677b(a)(4), (a)(1)(B)(ii), (b)(1).  Constructed value

represents: (1) the cost of materials and fabrication or other processing of any kind used in

producing the merchandise; (2) the actual amounts incurred and realized for selling, general, and

administrative expenses, and for profits, in connection with the production and sales of a foreign

like product, in the ordinary course of trade, for consumption in the foreign country; and (3) the

cost of packing the subject merchandise.  Id. § 1677b(e).  When calculating constructed value, if

Commerce determines that a particular market situation exists "such that the cost of materials

and fabrication or other processing of any kind does not accurately reflect the cost of production

in the ordinary course of trade, [then] [Commerce] may use . . . any other calculation

methodology."  Id.

## II.       Particular Market Situation Allegation

Plaintiffs argue that Commerce made an impermissible "sales-based" particular market situation determination on remand, when no "sales-based" particular market situation allegation was submitted before the time period expired and interested parties were not permitted to submit rebuttal factual information.  Thai Premium Cmts. at 8–9; Saha Thai Cmts. at 7–10; Pacific Pipe Cmts. at 3–5.  Commerce asserted that it relied on remand on the same cost-based particular market situation determination it made in the Final Results.  Remand Results at 15–16; see also Def.-Intervenor [Wheatland]'s Comments Commerce's Redetermination Remand at 4–5, ECF No. 69 ("Wheatland Cmts.").

The statute recognizes two types of particular market situations.  The first is a particular market situation that prevents a proper comparison between home market sales and the export price or constructed export price under Section 1677(15)(C).  19 U.S.C. § 1677(15)(C).  The second is a particular market situation that prevents "the cost of materials and fabrication or other processing of any kind" from "accurately reflect[ing] the cost of production in the ordinary course of trade . . . ."  Id. § 1677b(e).

The applicable regulation provides that "allegations regarding market viability or the exceptions in paragraph (c)(2) of this section, must be filed, with all supporting factual information, in accordance with § 351.301(d)(1)."  19 C.F.R. § 351.404(d).  One exception provided in paragraph (c)(2) specifies that "[t]he Secretary may decline to calculate normal value in a particular market . . . [if] a particular market situation exists that does not permit a proper comparison with the export price or constructed export price . . . ."  Id. § 351.404(c)(2)(i).  Section 351.301 does not have a subsection (d), but subsection (c) provides that "[a]llegations regarding market viability in an antidumping investigation or administrative review, including

the exceptions in § 351.404(c)(2), are due, with all supporting factual information, 10 days after

the respondent interested party files the response to the relevant section of the questionnaire,

unless the Secretary alters this time limit." Id. § 351.301(c)(2)(i); see Final IDM at 5

(recognizing that subsection (c) sets the deadline for allegations as to market viability, including

the exceptions in Section 351.404(c)(2)).  No deadline is specified for the submission of "factual

information in support of other allegations not specified in paragraphs (c)(2)(i)–(iv) of this

section," but if Commerce accepts such factual submission, Commerce must "issue a schedule

providing deadlines for submission of factual information to rebut, clarify or correct the factual

information."  19 C.F.R. § 351.301(c)(2)(v).

Here, Commerce properly accepted the Wheatland Allegation and afforded interested

parties the opportunity to submit information to rebut, clarify, or correct the allegation.

Wheatland alleged the existence of a particular market situation that distorted the cost of hot-

rolled steel coil.  Wheatland Allegation at 1, 4–5.  The Wheatland Allegation did not pertain to

market viability or a particular market situation that did not permit a proper comparison with the

export price or constructed export price, which would have fallen under 19 C.F.R. § 351.404(d)

as one of the exceptions identified in 19 C.F.R. § 351.404(c)(2).  The deadline for factual

submissions under 19 C.F.R. § 351.404(d) did not apply to the Wheatland Allegation.  Instead,

the Wheatland Allegation fell under 19 C.F.R. § 351.301(c)(2)(v) for "Other allegations," for

which there was no specified time limit. See Wheatland Allegation at 1, 4–5; Remand Results at

15.  The type of particular market situation alleged in the Wheatland Allegation and the

applicable submission deadline were not altered by Commerce's subsequent actions.  The court

concludes that Commerce's actions in accepting the Wheatland Allegation under 19 C.F.R.

§ 351.301(c)(2)(v) and setting a deadline for interested parties to submit information to rebut,

clarify, or correct the Wheatland Allegation were consistent with its regulations, and the Wheatland Allegation regarding a particular market situation distorting the cost of hot-rolled steel coil was not time-barred as argued by Plaintiffs.

### III.    Unauthorized Particular Market Situation Determinations

Plaintiffs assert that Commerce based normal value on constructed value without disregarding home market sales as outside the ordinary course of trade by any of the statutorily mandated methods.  Thai Premium Cmts. at 9–12; Saha Thai Cmts. at 3–13; Pacific Pipe Cmts. at 5–7.  Plaintiffs argue also that Commerce must show that a particular market situation prevented a proper comparison with the export price or constructed export price before it may disregard home market sales as being outside the ordinary course of trade under 19 U.S.C. § 1677(15)(C).  Thai Premium Cmts. at 9–11; Saha Thai Cmts. at 12–13; see Pacific Pipe Cmts. at 6–7.  Saha Thai contends that Commerce did not follow the applicable statutory requirement of 19 U.S.C. § 1677b(b)(1), which requires Commerce to first show that home market sales were made at prices below the cost of production by conducting the sales-below-cost test to determine which sales should be disregarded as outside the ordinary course of trade.  Saha Thai Cmts. at 11–12.

In the Final Results, Commerce determined that a particular market situation existed that distorted the cost of production and conducted the sales-below-cost test with an adjustment to the cost of production.  Final IDM at 9–10.  Commerce disregarded the below-cost home market sales and based normal value on the remaining home market sales.  Prelim. DM at 16.  The court concluded in Saha Thai I that Commerce was not permitted to "apply a cost-based particular market situation adjustment in the context of a sales-based comparison."  43 CIT at __, 422 F. Supp. 3d at 1371.

Commerce maintained the same particular market situation determination on remand that it made in the Final Results.  Remand Results at 16.  "Commerce relied on the cost-based [particular market situation] finding made in the *Final Results* in the Draft Results of Remand Redetermination, with no change to [its] determination that a cost-based [particular market situation] existed during the period of review."  Id.  Commerce asserted that a particular market situation in Thailand distorted the acquisition cost of hot-rolled steel coil, a major input for the subject merchandise, such that the respondents' cost of production of the subject merchandise did not reflect accurately the cost of production of the subject merchandise in the ordinary course of trade.  Id. at 19–20.

Commerce did not conduct the sales-below-cost test on remand.  Id. at 7–8.  Commerce declared that conducting the sales-below-cost test would not be "meaningful" without an adjustment to the cost of production—which the court prohibited in Saha Thai I—to account for the particular market situation and to compare "home market sale prices to a cost of production that does not accurately reflect production costs in the ordinary course of trade fails to accomplish the intent of the sales-below-cost test, which is to determine whether the respondents' home market sales were made in the ordinary course of trade."  Id.; see also id. at 19; Wheatland Cmts. at 2.  Commerce noted that "without being able to make a [particular market situation] adjustment in calculating the respondents' cost of production and perform an accurate sales-below-cost test, . . . the [particular market situation] in Thailand which distorted the acquisition cost of [hot-rolled coil] has resulted in each respondent's home market sales being outside of the ordinary course of trade."  Remand Results at 15.

Commerce's exclusion of home market sales due to distortions in the cost of production is not authorized by the statute.  Congress provided specifically in Section 1677(15)(A) for

Commerce to consider sales outside the ordinary course of trade when sales are below the cost of production. The path specified by Congress to determine that sales are below the cost of production is for Commerce to first conduct the sales-below-cost test set forth in Section 1677b(b)(1) to affirmatively confirm that sales are made below the cost of production as calculated according to Section 1677b(b)(3). Section 1677b(b)(1) provides:

> Whenever the administering authority has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product, the administering authority shall determine whether, in fact, such sales were made at less than the cost of production. If the administering authority determines that sales made at less than the cost of production—
>
> (A) have been made within an extended period of time in substantial quantities, and
>
> (B) were not at prices which permit recovery of all costs within a reasonable period of time,
>
> such sales may be disregarded in the determination of normal value. Whenever such sales are disregarded, normal value shall be based on the remaining sales of the foreign like product in the ordinary course of trade. If no sales made in the ordinary course of trade remain, the normal value shall be based on the constructed value of the merchandise.

19 U.S.C. § 1677b(b)(1). The statute directs Commerce to compare the reported home market sales prices to the cost of production calculated by adding the component costs and expenses listed in Section 1677b(b)(3). Id. § 1677b(b)(1), (3); see also Prelim. DM at 15. After conducting the sales-below-cost test, Commerce shall disregard those reported home market sales prices that are less than the calculated cost of production as outside the ordinary course of trade. 19 U.S.C. § 1677(15)–(15)(A).

Here, Commerce did not follow the specified method when it disregarded as outside the ordinary course of trade sales made purportedly at prices below the cost of production, without confirming that the sales were in fact made below the cost of production by conducting the sales-

below-cost test.  The statute requires Commerce to conduct the sales-below-cost test set forth in

Section 1677b(b)(1) before disregarding below-cost sales as outside the ordinary course of trade

under Section 1677(15)(A).  Nothing in the statute grants Commerce authority to bypass the

sales-below-cost test, and the specificity of the sales-below-cost test leaves no ambiguity.  See

Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a

legislature says in a statute what it means and means in a statute what it says there.").  The court

concludes that Commerce's exclusion of home market sales due to distortions in the cost of

production without conducting the sales-below-cost test to determine whether those sales were in

fact outside the ordinary course of trade is contrary to law.

Commerce's exclusion of below-cost sales is not redeemed by invoking Section

1677(15)(C) with a determination that the distorted cost of production created a particular market

situation preventing a proper comparison between reported home market sales prices and export

price.  Section 504 of the Trade Preferences Extension Act of 2015 ("TPEA"), Pub. L. No. 114-

27, 129 Stat. 362, added a particular market situation provision to the list of sales and

transactions outside the ordinary course of trade.  The amended provision provides:

> (15) Ordinary course of trade.  The term "ordinary course of trade" means the
> conditions and practices which, for a reasonable time prior to the exportation of the
> subject merchandise, have been normal in the trade under consideration with
> respect to merchandise of the same class or kind.  The administering authority shall
> consider the following sales and transactions, among others, to be outside the
> ordinary course of trade:
>
> > (A) Sales disregarded under section 773(b)(1) [19 USCS § 1677b(b)(1)].
> > . . .
> > (C) Situations in which the administering authority determines that the
> > particular market situation prevents a proper comparison with the
> > export price or constructed export price.

19 U.S.C. § 1677(15).  The statute defines "situations" narrowly as "sales and transactions" by

directing Commerce to consider "sales and transactions . . . to be outside the ordinary course of

trade [including] . . . [s]ituations in which [Commerce] determines that the particular market situation prevents a proper comparison with the export price or constructed export price."  See id.

Commerce did not explain how a particular market situation affecting sales and transactions in the home market prevented a proper comparison between reported home market sales prices and export prices.  In fact, Commerce conceded in the Remand Results that "[it] ha[d] not considered whether a [particular market situation] existed in the home market for the sale of the foreign like product such that home market sales cannot be used as the basis for normal value."  Remand Results at 15.  No allegation that a particular market situation affecting sales and transactions in the home market and preventing a proper comparison between reported home market sales prices and export prices was submitted.

Commerce determined instead "that the [particular market situation] with respect to the cost of production of circular pipes and tubes prevent[ed] a proper comparison of normal value based on the respondents' home market sale prices with the respondents' export prices or constructed export prices."  Id. at 8, 19–20; see also Def.'s Resp. Comments Remand Redetermination at 12–13, ECF No. 70 ("Def. Resp.").  Commerce did not explain how a particular market situation affecting the cost of production prevented a comparison between the reported home market sales prices and the export prices.  Commerce merely repeated its conclusory determination that the particular market situation as to cost of production prevented a proper comparison:

> [S]ection [1677](15)(C) of the Act states that Commerce shall consider situations in which we determine that a particular market situation prevents a proper comparison of normal value with the export price or constructed export price, to be outside the ordinary course of trade. On this basis, we find that the existence of the [particular market situation] concerning the cost of production of circular pipes and

tubes in Thailand precludes a proper comparison of normal value with U.S. price, pursuant to section [1677](15)(C) of the Act.

Remand Results at 19–20.

The statute cannot be read to authorize Commerce to make a particular market situation determination under Section 1677(15)(C) on the basis of distorted cost of production.  Congress provided a separate mechanism under Section 1677(15)(A) for Commerce to consider sales and transactions outside the ordinary course of trade when the cost of production of that merchandise is implicated.  Because Congress specified in Sections 1677(15)(A) and 1677b(b) the method by which Commerce may disregard below-cost sales, Congress obviated consideration of a particular market situation affecting the cost of production from Section 1677(15)(C).  An alternative reading would render impermissibly superfluous Sections 1677(15)(A) and 1677b(b).  Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 576 U.S. 519, 538 (2015) (citing Gustafson v. Alloyd Co., 513 U.S. 561, 574 (1995) ("[T]he Court will avoid a reading which renders some words altogether redundant.")).  The distinction between exclusions of sales as below the cost of production under Section 1677(15)(A) and exclusions of sales due to a particular market situation preventing proper comparison under Section 1677(15)(C) "makes a great deal of sense."  See Husteel Co. v. United States, 44 CIT __, __, 426 F. Supp. 3d 1376, 1388 (2020).  A particular market situation that affects the cost of production would presumably affect prices for domestic sales and export sales alike and thus would have no preclusive effect on the comparison between the two.  See id.  The court concludes that Commerce's cost-based particular market situation determination to disregard sales as outside the ordinary course of trade under Section 1677(15)(C) is contrary to law.

In response to Pacific Pipe's and Saha Thai's argument that Commerce cannot exclude home market sales based on a cost-based particular market situation determination, Defendant

asserts:

> Because the term "ordinary course of trade" is contained in 19 U.S.C. § 1677b(e), Commerce acted in accordance with the statute when it "found that a cost-based [particular market situation] existed in Thailand which distorted the acquisition cost of [hot-rolled coil], the primary input used in the production of circular pipes and tubes, [and, as a result] . . . that the respondents' cost of materials and fabrication or other processing do not accurately reflect the cost of production of circular pipes and tubes in the ordinary course of trade.

Def. Resp. at 9–10 (alterations in original). Defendant also argues that "Commerce's determination that it could not use the respondent's [sic] home market sales as the basis for normal value because they are outside of the ordinary course of trade" was lawful. Id. at 12. Defendant apparently argues that Commerce can disregard sales as outside the ordinary course of trade due to distortions in the cost of production based on Section 1677b(e)'s reference to the ordinary course of trade.

Commerce cannot invoke Section 1677b(e) as its authority to exclude home market sales and base normal value on constructed value. Section 504 of the TPEA amended the statutory provisions governing constructed value. The amendment provided for Commerce to determine whether a particular market situation distorted the cost of production when computing constructed value. The amended language provides:

> [F]or purposes of paragraph (1) [in reference to calculating constructed value] if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority [Commerce] may use another calculation methodology under this subtitle or any other calculation methodology.

19 U.S.C. § 1677b(e). Section 1677b(e) only applies if the precondition "for purposes of paragraph (1)" is met. Id. Paragraph (1) lists the costs to be added to calculate constructed value. Id. § 1677b(e)(1). Commerce must meet the precondition of calculating constructed value before it can rely on Section 1677b(e) to make a cost-based particular market situation

determination.  Here, Commerce had not met the precondition of calculating constructed value when it made a particular market situation determination based on distorted cost of production. Contrary to Defendant's assertion, Commerce was not authorized to make a cost-based particular market situation determination under Section 1677b(e), when the precondition of calculating constructed value was not yet satisfied.

Defendant's argument conflates the language in Section 1677(15) ("the following sales and transactions, among others, to be outside the ordinary course of trade") with the language in Section 1677b(e) ("the cost of production in the ordinary course of trade") based on the common phrase "ordinary course of trade."  See id. §§ 1677b(e); 1677(15).  The statutory framework sets forth a sequence of steps, as explained above, that Commerce must follow in determining antidumping duties.  Sections 1677b(a)(1)(B)(i) and 1677(15) provide that the home market sales price excludes sales and transactions made outside the ordinary course of trade.  Id. §§ 1677b(a)(1)(B)(i); 1677(15).  If the conditions to base normal value on constructed value are met, Section 1677b(e) provides that Commerce may consider whether the cost of production is reflected accurately in the ordinary course of trade.  Id. § 1677b(e).  The fact that the phrase "ordinary course of trade" is found in Section 1677b(e) does not insert "distorted cost of production" into Section 1677(15)'s list of sales and transactions outside the ordinary course of trade.  Defendant's interpretation is "untenable in light of [the statute] as a whole."  Dep't of Revenue of Or. v. ACF Indus., 510 U.S. 332, 343 (1994) (citing United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law . . . .")).

Commerce did not follow the statutory framework in this case. Commerce's determination that the cost of production is not reflected accurately in the ordinary course of trade is not interchangeable with a determination that sales are outside the ordinary course of trade.

The court concludes that Commerce's exclusion of home market sales is not in accordance with the law because Commerce unlawfully excluded purported below-cost sales without conducting the sales-below-cost test and Commerce unlawfully determined that a particular market situation existed under Section 1677(15)(C) based on distortions to the cost of production. The court concludes that Commerce's application of an alternative calculation methodology is not in accordance with the law because Commerce was not authorized to conduct a cost-based particular market situation analysis under Section 1677b(e) without a statutory ground for calculating constructed value. The court directs Commerce to remove the particular market situation determinations under Sections 1677(15)(C) and 1677b(e) as to the cost of production on second remand and recalculate the respondents' weighted-average dumping margins without disregarding home market sales from the calculation of normal value on that basis.

## CONCLUSION

The court concludes that Commerce's cost-based particular market situation determinations are not in accordance with the law.

Accordingly, it is hereby

**ORDERED** that the Remand Results are remanded for Commerce to remove the cost-based particular market situation determinations and recalculate the relevant margins without a particular market situation adjustment; and it is further

**ORDERED** that Commerce shall afford the parties at least twelve (12) business days to comment on the draft second remand results; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

(1) Commerce shall file the second remand results on or before February 16, 2021;

(2) Commerce shall file the administrative record on or before March 2, 2021;

(3) Comments in opposition to the second remand results shall be filed on or before April 2, 2021;

(4) Comments in support of the second remand results shall be filed on or before May 3, 2021; and

(5) The joint appendix shall be filed on or before May 17, 2021.

             /s/ Jennifer Choe-Groves
            Jennifer Choe-Groves, Judge

Dated:  December 21, 2020
    New York, New York